[Civ. No. 489.    Third Appellate District.—September 23, 1908.]

## H. C. CAPWELL COMPANY, a Corporation, Respondent, v. M. K. BLAKE, a Widow, Appellant.

LANDLORD AND TENANT—INJURY TO GOODS OF LESSEE—NEGLIGENCE OF OWNER IN ROOF DRAINAGE.—The owner of a building is liable to a lessee of storerooms on the ground floor for injury to his goods, resulting from the negligence of the owner in failing to control the drainage of rain water from the roof, causing such water to flow down a skylight well to the ground floor, the lease being silent as to any duty of the lessee to provide an adequate escape for such water.

ID.—CHANGE IN SYSTEM OF DRAINAGE—MUTUAL BENEFIT OF OWNER AND TENANTS—CONSENT OF PLAINTIFF—DUTY OF OWNER.—The fact that the construction of the skylight well made a change in the system of drainage for the mutual benefit of the owner and his

tenants, and that the plaintiff, who as lessee of the ground floor was specially interested and consented to such change for the benefit of his storerooms, which extended across the skylight well, could not relieve the owner from the duty of caring for the rain water on the roof, and to prevent the water from flowing down the sky-light well to plaintiff's injury.

ID.—EFFORT OF PLAINTIFF TO PREVENT DAMAGES—DUTY NOT ACKNOWL-EDGED—CONTRIBUTORY NEGLIGENCE.—The fact that plaintiff and its servants promptly endeavored to ascertain the cause of the trouble, and to find a remedy, if possible, so as to prevent further damage, which they could not accomplish, does not tend to show an acknowledgment of plaintiff's duty to care for the roof. The plaintiff would have been guilty of contributory negligence if the work of destruction had been supinely allowed to go on without any effort to prevent it.

APPEAL from a judgment of the Superior Court of Alameda County, and from an order denying a new trial. Henry A. Melvin, Judge.

The facts are stated in the opinion of the court.

Hill & Ryker, for Appellant.

Snook & Church, for Respondent.

CHIPMAN, P. J.—Action for damages brought by plaintiff as tenant against defendant as landlord, on account of damage to plaintiff's merchandise caused by flooding from a defective roof of the demised premises and from alleged negligent drainage of rain water therefrom. The cause was tried by the court, sitting without a jury, and plaintiff had judgment, from which, and from the order denying her motion for a new trial, defendant appeals.

The building in question is known as the Blake Block, and is situated on the corner of Twelfth and Washington streets, Oakland, and consists of three stories and basement. Originally the ground floor space was divided into eight rooms used for stores, of which plaintiff occupied all, except one room at the south end of the building, under a lease for seven years and four months, made on May 4, 1903, executed by defendant through her attorney in fact, Mrs. E. H. Havens. The second and third stories were let to various persons for various purposes. Mrs. Havens had an office in the building

and its janitor, in defendant's employment, resided there
with his family.   There was a light-well extending from the
basement up, open at the top, occupying a space eighteen by
forty-four feet between the walls down to the ceiling of the
first story, and thence down to the basement it was about
half that size.   The roof of the building drained into this
space and the water was carried down to the basement and
thence into the sewer by a pipe, which also served as a drain-
pipe for the toilets.   It was proposed by the parties to con-
vert the entire space occupied by plaintiff into one large store,
which involved the removal of partitions, and the walls of the
light-well which extended across the rear of one of the stores.
These changes also required some readjustment of drain pipes,
remodeling of the roof in the light-well, and placing therein
a skylight for the accommodation of the enlarged storeroom.
The skylight, of dimensions eleven by seventeen feet, rested
on the subroof, eighteen by forty-four feet, which extended
over the area of the light-well, about level with the floor of the
second story.   A photographer's gallery and the toilet of the
second story floor projected somewhat over this area but not
to interfere with the skylight.   The only means of access to
the subroof of this area were through windows in the second-
story hall or of the abutting rooms occupied by tenants or the
toilet.   To reach this subroof by the hall windows it was neces-
sary to crawl under the photographer's room, the floor of which
was about two feet above the tin roof of this area.   Originally
the main roof was drained to a pipe and thence down the
light-well to the basement and sewer, this pipe also being
connected with the toilets.   In the remodeling of the consoli-
dated stores it became necessary to shift the location of this
pipe, where it passed through the store, a few feet to a hollow
column, supporting the roof, through which the drain-pipe was
carried, and the column was inclosed by woodwork.   This
pipe leading from the upper roof was cut at the subroof and
an elbow placed on it, so that it discharged the rain water
falling on the main roof directly on this tinned subroof
at a point eight or ten feet from the opening in the pipe that
ran through this column and on down to the basement and
sewer.   At this opening in the subroof a screen or perforated
hood was placed over the pipe to admit water but exclude
rubbish which might run into the pipe and stop the flow of
water through it.   The store below extended in all directions,

from a point under the skylight, and the goods and merchandise of plaintiff were displayed throughout the entire floor area and also in the basement under this skylight. The work of changing over these stores was completed sometime in March, 1904, and, so far as appears, was done in a workmanlike manner and to the satisfaction of plaintiff. There seems to be no question but that the rearrangement of the drainage system of the building was adequate, had nothing happened to change it. But from some unknown cause the screen over the exit pipe of this subroof had been removed and obstructions had been allowed to accumulate in the pipe, thus causing the water coming from the main roof and falling directly on this subroof to rise to the depth of several inches and to escape over the top of the flashings of the tin roof built into the side walls and around the skylight and thence down into the store below, causing the damage complained of. All the work done in remodeling the building was undertaken by defendant and at her expense and under the direction of her agents, and agreeably to plans satisfactory to plaintiff, except certain improvements to the store front which plaintiff agreed to make.

The court found, among other facts, that this subroof on which water accumulated and from which it ran down into plaintiff's store "was then and there in the possession and under the control of said defendant; and said defendant then and there carelessly and negligently allowed and permitted and caused said rain water to accumulate in such large quantities upon said roof that by reason thereof said rain water thereupon overflowed a certain skylight situated upon said roof, leaked through certain tin flashings next to the brick walls and said buildings surrounding said roof, and ran into, upon and flooded said personal property so located in said store and basements aforesaid, and thereby and in consequence thereof damaged and injured said personal property of said plaintiff in the sum of $3,673.25."

Appellant states in her brief that "the most important question to be considered here, in fact the only question, is who, under the terms of the lease, had control of the skylight roof." We quite agree with appellant that the question of defendant's liability hinges entirely upon the assumption that it was her duty, and not that of plaintiff, not only to provide adequate escape for rain water falling upon the roofs of the

building, but also to see that the means thus provided were kept free from obstruction. There is no provision of the lease in terms placing this duty upon either party. It purports to "let and demise" certain "stores," giving their numbers on the street, "including basements thereof under said stores, and all room or space available or that may be made available for use under the sidewalks in front of said stores, with the appurtenances." Other covenants relate to subletting and such as are usually found in leases, but nothing touching the care of the premises. The lease was entered into before the changes in the building were made, but in accordance with an agreement previously entered into or option given plaintiff to lease the premises, by which, in the event that plaintiff exercised the option, defendant agreed "to remove walls and partitions between said stores as desired by the party of the second part, so far as the same may be done without endangering the buildings; to provide proper and acceptable toilets (and to renew and place in good condition, so far as may be required, all the premises included in this agreement)." The changes made were for the mutual benefit of the parties, and so far as concerned plaintiff related only to the several stores which he was given the option of leasing, in consideration of which, if accepted, the changes were to be made.

Appellant refers to certain principles as established by the decisions of appellate courts and to certain facts in the case from which it is argued that respondent had and took control of the skylight under its lease of the storeroom below. It is claimed that the rule is almost universal that a lease of a part of a building passes with it everything necessarily used with or necessary to the enjoyment of the demised premises (*Kitchen Bros. Hotel Co.* v. *Philipin,* 2 Neb. (Unof.) 340, [96 N. W. 487]); that a description of premises by the street number includes so much of the lot upon which the building rests as is necessary to the enjoyment of the building (*Hosher* v. *Hestermann,* 58 Ill. App. 265); that a lease of the "first floor" in a building includes the use of the outside walls thereof in the absence of anything to the contrary in the lease (*Lowell* v. *Strahan,* 145 Mass. 1, [1 Am. St. Rep. 422, 12 N. E. 401]); that in the lease of a building there is no implied warranty that it is safe, suitable for habitation or properly adapted to the uses to which it is to be applied, nor that

it shall continue fit for the purposes for which it was demised. (*Davidson* v. *Fischer*, 11 Colo. 583, [7 Am. St. Rep. 269, 19 Pac. 652].) It is hence argued that the skylight was a necessary part of the premises for the complete enjoyment of the part demised; that no reservation of this skylight was made by the lessor, and that under the terms of the lease and the option agreement the skylight necessarily became a part of the demised premises, and its care and control passed to the lessee. Turning to the facts proven, it is claimed that they confirm this view. Attention is invited to the testimony showing that the alterations were made to the satisfaction of plaintiff and in accordance with plans agreed upon by it; that the skylight roof was tinned and cleaned and placed in a condition satisfactory to plaintiff; that plaintiff knew that the water coming from the upper roof had to be drained through a pipe coming from the skylight area, and was therefore fully apprised of the conditions and retained possession of the premises with this knowledge. Defendant's janitor, Albro, testified that after the completion of the work Mr. Capwell, president of plaintiff company, requested him to look after the skylight area and that he would pay him for his services. Mr. Capwell denied this and the learned trial judge, in referring to this testimony, recited facts and circumstances which led him to conclude that Albro was mistaken and that Capwell did not make any such promise.

It appeared that the leak in the roof was first discovered during a rainstorm about 9 o'clock of the night of September 22, 1904. Plaintiff's watchman, Bostwick, notified defendant's janitor, Albro, and also called up by telephone plaintiff's bookkeeper, Furth, who came to the store and notified Capwell. Steps were taken to protect the goods from injury so far as presently possible, and the three men went up to the roof through a second-story toilet window; water was then standing on the subroof to some depth. Observing a break in the drain-pipe on or near the upper roof from which water was flowing, Furth tied a cloth around this opening, forcing the water back into the pipe. He asked Albro where the opening was at the subroof, but was told that he did not know. Having no light, the party made no search at that time for this opening, but went below into the store and continued their efforts to protect the merchandise. The leak seemed to abate somewhat and Furth went home. The next

morning about 7 o'clock the water began coming down worse than before, and Furth was again called and promptly responded and went about protecting the goods in every possible way. Bostwick testified that he notified the janitor, Albro, several times during the night; "that when the main flood occurred about 7 in the morning, he went upstairs and woke the janitor again and then went out on the roof and found the outlet, and was standing in water ankle deep on the roof where the skylight was and he got some pieces of glass and shavings and pieces of gunny rope or bale rope out of the outlet; he notified the janitor three times that night; and that the janitor of the Blake Block telephoned for the plumber to come." Witness Maddern, a plumber, responded, as also did witness Rankin, another plumber. Maddern pulled some rubbish out of the pipe below the opening and finding no relief went below to examine the sewer, and while he was gone witness Rankin succeeded in relieving the pipe of its obstructions with a force pump or plunger obtained from janitor Albro, "who was out there working it when he appeared." Albro testified that he had been on the skylight area fifty times or more and had always cleaned it before a rain; that he had charge of the rooms of the upper stories for defendant and that it was his duty to keep the roofs clean. It is true that he testified that Capwell had requested this of him, suggesting the inference that this duty was put upon him by plaintiff and not by defendant. But the court held otherwise upon the evidence. Albro was, however, reminded by Capwell several times to keep the area roof clean and Albro told Capwell he had been told to do so but "had been too busy to come to it." Capwell also testified that he saw Mrs. Havens, defendant's agent, the morning of this occurrence and was assured that the difficulty would be removed, "so that we would not sustain a flood in case it should rain again." Capwell also testified that plaintiff had nothing to do with the work above the ceiling of the store or with the care or control of the skylight area or lightwell. It appeared that this light-well was built to give light and air to the upper stories as well as to the ground floor and basement. The area roof was in part built before the remodeling of the stores was begun and extended under the photograph gallery. The changes made required the closing of the light-well at the floor of the second story, but the sky-

light became necessary, as a part of this subroof, to give light to the store below. Defendant, however, retained the use of the drainage system down through this well and through plaintiff's store, and this use was necessary to the drainage of the roof over the main building, with no part of which latter plaintiff had anything to do or any control except the store and basement. Speaking of the situation as disclosed by the evidence, the court, in its oral opinion at the close of the evidence, said: "It seems that this pipe coming from the top of the building, down over the roof of the photographer's room was an old pipe that had been in use for a long time. Originally it was conducted down through the light-well to the sewer, and taken care of in that way. Now, of course, when these alterations were made two things were necessary. One was that Mr. Capwell's store should be protected from the elements, and another was that there should be some provision still for carrying off the water from the top of the building. That was undertaken by Mr. Spence, employed by the owner of the building. And the largest function of this roof in the way of carrying water was to carry water from the upper roof, because there was a very much larger area of drainage there than there was on this lower roof. I think under all of the evidence in the case I am bound to hold that the owner of the building had appropriated that roof, or at least a portion of it, as if it were a pipe for the purpose of carrying off the water from the upper part of the building, as well as the small amount of water that might fall upon that roof."

If plaintiff had leased the entire building, the principle relied upon by defendant would have some application. But this is not such a case. In *Looney* v. *McLean*, 129 Mass. 33, [37 Am. Rep. 295], speaking of the general rule that there is no implied warranty of the safety and adaptation of the building to the uses of the tenant, it was said: "A lease does not imply any particular state of the property let or that it shall continue fit for the purpose for which it is let, nevertheless its application is limited to premises which by the terms of the lease pass out of the control of the landlord into the exclusive possession of the tenant." The cases relating to patent and latent defects have no application here, for the court found on sufficient evidence that the responsibility for draining the upper roof was upon defendant, who negligently

performed this duty. In such case defendant became liable
to plaintiff for damage thereby suffered. (*Edwards* v. *New
York & H. R. Co.,* 98 N. Y. 245, [50 Am. Rep. 659].) There
were many tenants of the upper stories; the main roof of
the building sheltered the rooms occupied by them quite as
much as the store below; it would be unreasonable to presume
that plaintiff impliedly assumed the care of this roof or under-
took to provide means for the escape of water from it. The
damage resulted not from rain water falling upon the skylight
nor upon the subroof, but rather from the volume of water
poured upon the latter from the upper roof, which was pro-
vided with no means of escape except to run across the sub-
roof to the pipe which had originally carried the water di-
rectly from the main roof. Had this pipe remained as first
constructed it is not likely that the damage would have fol-
lowed. Nor does the fact that this change was for the better
accommodation of plaintiff in rearranging the stores affect
the question or relieve defendant from the duty of caring
for the water that was to fall upon the roof. We think the
trial court correctly interpreted this subroof as being in
effect a continuation of the pipe from the main roof which
could safely perform the function marked out for it only
by keeping the pipe running down through the store free and
open for the unobstructed passage of water coming to it across
the subroof. As it was the duty of defendant to see to this,
it is immaterial whence the obstruction came—whether by ac-
cident or design dropped or thrown upon the subroof by ten-
ants of the upper stories, suggested by defendant as a pos-
sible cause for the stoppage of the pipe.

The fact that plaintiff and its servants promptly endeavored
to ascertain the cause of the trouble and to find a remedy is
mentioned as a circumstance tending to show an acknowledg-
ment of plaintiff's duty to care for this roof. To our mind
it has no such significance. They would have been guilty of
contributory negligence had they supinely sat down and al-
lowed the work of destruction to go on, making no effort to
avert it.

Much stress is placed by defendant upon the fact that
Capwell took especial interest in the plans for the remodel-
ing of the storerooms; made suggestions as to changes, and
was cognizant of the manner by which the water from the
main, as well as the subroof, was to be cared for; and finally

,approved the work when completed. These circumstances are not necessarily inconsistent with the assumption by defendant of the care and control of the roofs of the building, nor do they impliedly or presumptively tend to charge plaintiff with such care and control. Plaintiff's interest in the building was in the rearrangement of the stores. Incidental to this arose the necessity for a skylight and to provide different means for conveying the water from the roofs to the sewer. Naturally, plaintiff was concerned in knowing that these means were adequate, and so they were had they been properly looked after; and here again we are confronted with the sole question of fact—upon whom rested the duty to care for the system of drainage adopted?

With the exception of the testimony given by janitor Albro and his wife, which the court disbelieved, and which was in conflict with the testimony of Capwell, there is no direct evidence that plaintiff ever assumed any control whatever of the skylight area. On the contrary, there was evidence that such control was assumed by defendant; and the conduct of the parties shows that from the time the work was commenced by the defendant, during its progress, after it was completed, and up to the time of the damage and in repairing the pipes after the disaster, the responsibility was assumed by defendant.

It was held in *Priest* v. *Nichols,* 116 Mass. 401, that where a tenant occupying a portion of a building is damaged by the escape of water from pipes used by and under the control of the landlord, who occupies the remainder of the building, the landlord will be held liable. The case of *Toole* v. *Becket,* 67 Me. 544, [24 Am. Rep. 54], is cited by respondent and we think states the law correctly in a similar case to the one here. The court said: "The plaintiff hired the lower portion of a building for a store, the upper portion remaining in the possession of the defendant and under his care and control. A rainstorm poured a great volume of water between the roof and the chimney down upon the plaintiff's goods, causing some injury. The charge is that the defendant was guilty of negligence, either on account of the original construction of the roof or in the way and manner of maintaining it. The case both of law and fact is referred to the court. It is well settled that in a lease of real estate no covenant is implied that the lessor shall keep the premises in repair or otherwise

fit for occupation. But that is not this case. Here the plaintiff had no care or control of the roof and had no right to intermeddle with it. The defendant had such care and control for the benefit of himself and all his tenants. By implication he undertakes so to exercise his control as to inflict no injury upon his tenants. If he does not exercise common care and prudence in the management and oversight of that portion of the building which belongs to his especial supervision and care, and damages are sustained by a tenant on that account, he becomes liable to him. He is responsible for his negligence." (Citing cases.) See *Davis* v. *Pacific Power Co.*, 107 Cal. 563, [48 Am. St. Rep. 156, 40 Pac. 950], for a somewhat analogous case.

Some errors are claimed to have been made by the court in admitting and excluding testimony, but as they are not argued and no reasons given in support of these specifications we have not noticed them. We have addressed ourselves to what appellant stated in her brief as the only question in the case.

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.