[Civ. No. 3465. Third Appellate District.—April 6, 1928.]

THE RATHBUN COMPANY (a Corporation), Respondent, v. G. C. SIMMONS, Appellant.

Elliott, Atkinson & Sitton for Appellant.

White, Miller, Needham & Harbor for Respondent.

PRESTON (H. L.), J., *pro tem.*—This is an action for damages brought by plaintiff, as tenant, against defendant, as landlord, on account of damage to plaintiff's merchandise, caused by rain-water from the roof of the demised premises.

The action was tried by the court sitting without a jury, and judgment was entered in favor of plaintiff for the sum of $2,000, from which judgment the defendant prosecutes this appeal.

The defendant and appellant owned a five-story brick building situated in the city of Sacramento and known as "Inverness Building." The first story and basement of the building were leased to respondent and used by it in

conducting a ladies' wearing apparel store. The upper stories were leased by appellant to one J. P. Gallagher, who conducted a hotel therein. An open light well, two or three feet wide by three and a half feet long, extended from the first story upward, so that under the light well the building is in effect but one story high. Respondent's store, therefore, was partly covered by a subroof, or the floor of this light well, and partly by the floor of the second story. This light well gave ventilation and light to the rooms of the hotel, on the second, third, fourth and fifth floors of the building. The building is so constructed that the entire roof is drained into the light well. The main roof is drained into a pipe which leads from the upper roof to a point a short distance above the subroof, where it discharges the rain-water falling on the main roof directly on the subroof. The water then flows over the subroof for a distance of about two feet to a catch-basin or hopper, located in the center of and beneath the subroof and which is protected by a screen or perforated hood. After entering this hopper or catch-basin, the water is discharged into a pipe which is recessed in the north wall of the building, and which conducts it into the basement, from whence it is carried out to the gutter in the street. The particular function of the subroof in the way of carrying water is to carry water from the upper or main roof, because there is a very much larger area of drainage there than is on this lower roof.

The court found, among other facts, ''That on or about said 8th day of November, 1924, and while the said personal property of said plaintiff was so located and stored in said store as aforesaid, large quantities of rain water were precipitated and deposited upon the roof of that portion of said building immediately over said store and which said roof was then and there in the possession and under the control of said defendant; that said defendant negligently and carelessly permitted and suffered said roof and the drain therein to become in a state of disrepair and incapable of carrying off the rain water so deposited and precipitated on said roof and then and there negligently and carelessly permitted and caused said rain water to accumulate in such large quantities upon said roof that by reason thereof, and without any fault on the part of said plaintiff, said rain water leaked through said drain and said roof and ran

into, upon and flooded said store so occupied by said plaintiff and said personal property of said plaintiff so located in said store, and thereby and in consequence thereof damaged and injured said personal property and the plaster on the ceilings and walls of said store, thereby interfering with the said plaintiff's quiet enjoyment of said demised premises as tenant of said defendant, and that said plaintiff was damaged thereby in the sum of $2,000.00 lawful money of the United States.''

The first and most important question to be determined is, who, under the terms of the lease, had control of the subroof and drainage system in said building.

On August 11, 1923, the appellant leased to respondent ''that certain first story and basement of a five story brick building, and its appurtenances, known as 'Inverness Building,' for a term of five years from September 1st, 1923.'' Said lease also contained the following provisions: ''It is further agreed that said party of the first part shall not be called upon to make any improvements or repairs or replacements whatsoever upon the said demised premises, or any part thereof, but said party of the second part (respondent herein) agrees to keep the same in good order and condition at its own expense, including the replacement of all plain and plate glass if broken from any cause, and replace all plaster if broken or damaged from any cause. The entrance hall and stairway and elevator were excepted from the lease, as was also the basement area containing the elevator machinery and heating plant. The lease further provided: ''It is also understood and agreed that the party of the first part (the appellant herein) shall not be held responsible for any act or neglect of the tenants in the hotel above the store hereby leased, and it is further understood and agreed that the said party of the second part shall keep the said premises at all times in a neat and sanitary condition as required by the rules and regulations of the Board of Health and the plumbing ordinances of the City of Sacramento.''

Thus it will be seen from the terms of the lease that the lessor (appellant herein) was not to be called upon to make any repairs to the leased premises, and that the lessee (respondent herein) agreed to keep the demised premises in

good order and condition. It is clear that these covenants in said lease, however, applied only to the *demised premises;* that is to say, to the premises which by the terms of the lease passed out of the control of the lessor and into the exclusive possession and control of the lessee, and not to any portion of the building not covered by the lease. We find no provision in the lease which places the duty of caring for the drainage system, or the roof, or the sub-roof, upon either the lessor or the lessee. ▆ The rule is well established that in the absence of an express covenant by the landlord to make necessary repairs, the tenant is the one to keep up the leased premises. (*Capwell Co.* v. *Blake,* 9 Cal. App. 101 [98 Pac. 51]; *Longbotham* v. *Takeoka,* 115 Or. 608 [43 A. L. R. 1285, 239 Pac. 105].) The reason for this rule is that the tenant takes the estate as he finds it with its advantages and drawbacks, and if he would protect himself against the expense of betterment, he must either not acquire the tenancy or exact from the landlord a covenant to make the repairs necessary to the enjoyment of the estate. ▆ The application of this rule, however, cannot be extended beyond the premises leased; the tenant cannot be held to repair that over which he has no control or authority. In *Longbotham* v. *Takeoka, supra,* the court said: "Responsiblity, whether of the landlord or the tenant, follows and is measured by the control lodged in one or the other. Merely because A is landlord and B is tenant does not excuse A from liability for damage he inflicts upon B by operation of an appliance in the control of the former."

Turning to the testimony in the case, we find that Ralph H. Rathbun, president of respondent corporation, testified that he had no access from his store to the subroof or upper floors of the building, and in order to gain access from his store to this subroof, he would have to go upstairs and get permission from the proprietor of the hotel, in order to get access to the rooms through which he would have to pass in order to go out on this subroof; that he could not see the light well from his store because there was a solid ceiling in the store. Rathbun testified that he had never seen or examined the light well and in fact did not know there was a light well in the building until after the dam-

age had occurred. Mr. Gallagher, who conducted the hotel on the upper floors, testified as follows: "Q. How could you obtain access to this light well from the main floor? A. Well, there is no access for anybody to go through unless they climb through my apartment, and go through the the window. Q. Is there any means to obtain access to that light well from any other apartment besides your apartment? A. Yes, you can go in through any of those windows, different apartments. They could come in from the other side, from the 'Argus Building,' could climb through there, if they wanted to, and go down there. Q. The Argus Building is located where? A. Joins the Inverness Building. . . . Q. In reference to those windows which open out upon the light well there, how many windows open out upon the light well, that it is possible to go out and obtain access to the well, what area of the roof. . . . A. It would be the first tier of windows on that floor."

From the foregoing testimony, and other testimony of a similar character, it seems clear that respondent did not have access to the roof or light well, and, in fact, had no knowledge of the system of drainage provided for the building, or even the existence of a light well until after the damage occurred.

From all these facts we conclude, therefore, that respondent was not required by the lease to keep in repair the light well and the roof. Neither did he impliedly assume such responsibility. The main roof of the building sheltered the rooms used by appellant's other tenant, Gallagher, as a hotel, and it would be unreasonable, under the facts, to hold that respondent was responsible for the care of the roofs under his lease covering only the ground floor and basement, or that he assumed the care of the roofs or undertook to provide means for the escape of the water from them. On the other hand, from the facts revealed by the record, it seems clear to us that it was the duty of appellant to provide an adequate means for the escape of rain-water falling upon the roof of the building, and also to see that the means employed for that purpose were maintained in good order and condition and capable of serving the purpose, and if he was negligent in this regard, he

would be liable to respondent for any damages suffered thereby.

Appellant contends that, even conceding this to be true, still, the evidence fails to disclose any negligence on his part. This contention is based upon the testimony of Mr. Gallagher, the proprietor of the hotel on the upper floors of the building, to the effect that he cleaned the roof on the day before the store was flooded and everything seemed to be in perfect condition as far as outward appearances were concerned, and that theretofore no leaks or trouble with the drainage system had been discovered; also, upon the testimony of Mr. Rathbun, the president of respondent corporation, that he, together with Mr. Gallagher, examined the roof on the morning after the flooding of the store and could not ascertain the cause of the leak; and also, upon the testimony of the appellant to the effect that he had never had any complaint from any of the tenants prior to the time of the damage in question that the drainage system was not adequate, and had never prior to the damage to respondent been notified that the drainage system was out of repair.

 Upon this testimony, appellant argues that he was entitled to notice of the defects, and unless it is shown he had notice or actual knowledge, or unless the defect was apparent on a reasonable inspection, he cannot be held negligent. The cases cited by appellant upholding this doctrine are not applicable under the facts of the case at bar. In this case, as we have seen, a portion of the property is occupied by one tenant and another portion by the other tenant, and a single system of draining the roof is maintained for the benefit of all. It cannot be successfully contended that it was incumbent upon respondent, who had no care or control over the roof and no right to intermeddle with it, to give appellant notice of the repairs to be made in the roof, especially when the testimony shows without conflict that respondent did not know that the drainage system needed repairing, and did not possess the means of acquiring such knowledge.

The precise trouble with the drainage system was in and around the catch-basin or hopper, which was set under the subroof of the building, and it was necessary for the

plumber to cut a patch off of the subroof about sixteen inches square to gain access to this hopper. When this was done, the plumber found that this catch-basin or hopper, as it is called, was nothing more than a square box made of a cheap grade of tin or galvanized iron, set on the top of the drain-pipe, and that said hopper had rusted apart, was full of holes, and resembled a "sponge," so the water could go through and percolate from the hopper or basin into the ceiling, and the pipe on which the hopper rested had also decayed and was rusty and full of holes.

There was other testimony to the same effect, which is not necessary to quote, but there is sufficient evidence to support the findings and judgment of the court on the question of negligence.

The question of appellant's liability hinges entirely upon the conclusion that we have reached, that it was his duty to provide an adequate drainage system for his building and to keep it in a good state of repair. (*Capwell Co.* v. *Blake, supra,* and cases there cited.)

The cases cited by appellant relating to patent and latent defects have no application here for, as we have seen, the responsibility for draining the roof was upon appellant, who negligently performed this duty.

There is no merit in the contention of appellant that the dilapidated condition of the catch-basin or hopper, could not be discovered because it was set underneath the subroof and covered by a screen. There is no evidence in the record, that we have been able to discover, which states that it was customary or proper in installing an adequate drainage system for a building such as the "Inverness Building," to permit the drainage system to be installed or constructed in such a manner that it could not be thoroughly inspected without taking out a portion of the roof and, in the absence of such a showing, appellant was no doubt negligent in permitting it to be so constructed.

After a careful consideration of the entire record, we are of the opinion that there is ample evidence to support the conclusions of the trial court upon the question of appellant's negligence.

We think the judgment should be affirmed, and it is so ordered.

Hart, Acting P. J., and Plummer, J., concurred.